## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ROBERT DAVIS, INDIVIDUALLY**
**AND AS ADMINISTRATOR OF THE**
**ESTATE OF HIS MINOR CHILD,**
**JASMINE DAVIS; AND TARA**
**DAVIS**

**CIVIL ACTION**

**VERSUS**

**NO:  05-2679**

**BAKER HUGHES OILFIELD**
**OPERATIONS, INC.**

**SECTION: "S" (4)**

### ORDER AND REASONS

Defendant Baker Hughes Oilfield Operations, Inc. ("Baker Hughes") has moved for summary judgment, dismissing the claims by plaintiff Robert Davis against it because the claims were fully, completely, and unconditionally released prior to the filing of this lawsuit.  (Doc. #32).  Baker Hughes also has moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure. (Doc. #40).

**IT IS HEREBY ORDERED** that Baker Hughes' Motion for Summary Judgment is

**DENIED.**  (Doc. #32).

**IT IS FURTHER ORDERED** that Baker Hughes' Motion for Rule 11 Sanctions is

**DENIED**. (Doc. #40).

## I.  BACKGROUND

Plaintiff, Robert Davis, suffered an injury to his right arm on November 29, 2004, while

working as a roustabout aboard the drilling rig THE 75, which is owned by his employer, The

Offshore Drilling Company ("TODCO").  Davis was struck on the arm by a 2x4 being swung by

Steve Bishop, who was an employee of Baker Hughes.

Davis reported the accident to his supervisor, TODCO crane operator, Greg Sculthorp,

who told Davis to wait and see if the pain would go away so that the accident would not have to

be reported.  On November 30, 2004, Davis was in severe pain and an accident report was

completed.  On December 1, 2004, Davis went to shore where he was met by Steve Murray, an

employee of Shuman Consulting, which is TODCO's claims adjusting company.  Murray

arranged for Davis' medical care in Houston, Texas, where he was hospitalized from December

1, 2004 to December 7, 2004.

Dr. Frank Barnes, who was the primary physician attending to Davis, consulted with Dr.

Fernando Levaro to determine whether Davis had compartment syndrome in his right arm.[1]

Based on Levaro's examination of Davis, and his review of the testing that had been performed,

---

[1]Compartment syndrome is a state of decreased perfusion in a closed compartment and
may result from bleeding inside the arm and can result in death of tissue.

2

Levaro was of the opinion that Davis did not have compartment syndrome.[2]  Davis was

discharged from the hospital on December 7, 2004, and instructed to follow up with a physician

near his home in Brookhaven, Mississippi.

 Kurt Kramer, of Shuman Consulting, took over the management of Davis' case upon his

return home.  Kramer arranged for Dr. Eric George in Metairie, Louisiana, to examine Davis on

December 9, 2004.  Dr. George referred Davis to Dr. Arturo Leis, a neurologist, in Jackson,

Mississippi, on January 4, 2005.  Dr. Leis performed an electomyogram and nerve conduction

study to determine if any nerve injury was causing Davis' pain and numbness in his arm and

hand, and to rule out compartment syndrome.[3]  According to Dr. Leis, the neurological testing

was reported as normal with no electrodiagnostic evidence of compartment syndrome.[4]  Dr. Leis

recommended that "somatosensory evoked potential studies" be performed to assess the

condition of the sensory pathways of the spinal cord and brain to determine why he had "such

profound hand numbness.".[5]  The study was never performed, nor did Davis receive therapy.  Dr.

Leis noted that his examination indicated some objective signs of reflex sympathetic dystrophy

("RSD"), which included mild to moderate swelling in the distal right upper arm and hand, and

dystrophic skin changes in the right hand that consisted of thinning and flaking of the skin on the

---

[2]*See* Exhibit D (Deposition of Dr. Fernando Levaro), pp 6, 12-13, attached to Plaintiff's
Memorandum in Opposition to Motion for Summary Judgment.

[3]*See* Exhibit E (Deposition of Dr. Arturo Leis), pp. 8-17, attached to Plaintiff's
Memorandum in Opposition to Motion for Summary Judgment.

[4]*Id.* at 16.

[5]*Id.* at 17.

right hand.[6]  Dr. Leis suggested the possibility of RSD in his report to Dr. George, and

recommended agrresive physical and occupational therapy.[7]

On January 12, 2005, Dr. George examined Davis.  Kramer, who was at the appointment,

discussed the findings with Dr. George.  Dr. George did not believe RSD was a possible

diagnosis, and did not include RSD as a differential diagnosis in any of his reports.[8]

Kramer contacted Davis and informed him of another medical appointment with Dr.

George on January 26, 2005.  He told Davis that he would provide a driver and vehicle to

transport him and his wife from their home in Mississippi, and back.  On the morning of January

26, 2005, rather than going to Dr. George's office, they were taken to the offices of Shuman

Consulting in downtown New Orleans.  Kramer showed Davis and his wife a letter, dated

January 19, 2005, from Dr. George to Kramer stating that it was his opinion that there was "no

evidence of nerve injury and no pathophysiologic condition that would be explained from

[Davis'] arm injury."[9]  The letter suggested that Davis may be suffering from a possible brain

injury or other neurological condition.  In Dr. George's opinion, Davis did not need further

"medical treatment of his right arm as causally related to his trauma."  Dr. George opined that

---

[6]*Id.* at 25-26.

[7]*Id.* at 17.  *See also* Report attached to Deposition of Dr. Arturo Leis.

[8]*See* Exhibit F (Deposition of Dr. Eric George), pp. 50-51, attached to Plaintiff's Memorandum in Opposition to Motion for Summary Judgment.

[9]*See* Exhibit 1, attached to Exhibit G (Affidavit of Tara Cody Davis) of Plaintiffs' Opposition to Motion for Summary Judgment.

Davis had reached maximum medical recovery.[10]

Krammer announced to Davis that he did not have an appointment with Dr. George. Krammer further informed Davis that TODCO was going to terminate him,[11] and discussed back pay for Davis since the date of the accident.[12]  Kramer informed Davis that TODCO would pay him $5,000,[13] but that before he could receive the money he had to sign some papers.  Kramer then transported Davis and his wife to the law offices of Lemle & Kelleher, L.L.P., counsel for TODCO, and presented them with a "Receipt, Release and Indemnification Agreement"[14] which applied to Baker Hughes, as well as TODCO.  Davis, who was not represented by an attorney, was provided an opportunity to ask questions.  Davis testified under oath that he understood the terms of the release and that he agreed to its terms.  After Davis signed the release, he and his wife were driven back to their home in Mississippi.

In late April 2005, Davis experienced severe pain, swelling, and redness in his right arm, and Davis went to the University Medical Center in Jackson, Mississippi.  He was diagnosed

---

[10]*See* Exhibit 1, attached to Exhibit C (Affidavit of Robert Davis) of Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment.

[11]The release contains an acknowledgment by Davis that he "voluntarily and permanently resigned."

[12]Although Davis had been receiving maintenance payments, he had not been receiving paychecks.

[13]The $5000 consisted of $4000 for this accident, and $1000 for an earlier incident.  The issue of adequacy of consideration is not reached in this motion.  Additionally, the issue of the extent of liability of Baker Hughes is not reached.

[14]*See* Exhibit 4, attached to Defendants' Motion for Summary Judgment.

with RSD related to the accident of November 29, 2004.  Davis has since undergone surgery for

the implantation of a spinal cord stimulator and a morphine pump to ease the pain.  He is

permanently disabled from performing any work.

Davis filed this lawsuit against Baker Hughes on June 29, 2005.  Davis' complaint did

not mention the release, and Davis' counsel did not disclose the existence of the release to Baker

Hughes' counsel.  Baker Hughes seeks summary judgment dismissing the case based on the

release, and seeks sanctions under Rule 11 of the Federal Rules of Civil Procedure for the filing

of a frivolous lawsuit.

## II.  DISCUSSION

**A.      Defendant's Motion for Summary Judgment.**

**1.      Summary judgment standard**.

Summary judgment is proper when, viewing the evidence in the light most favorable to

the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is

entitled to judgment as a matter of law."  *Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805,

809 (5th Cir. 1991); Fed. R. Civ. P. 56(c).  If the moving party meets the initial burden of

establishing that there is no genuine issue, the burden shifts to the non-moving party to produce

evidence of the existence of a genuine issue for trial.  *Celotex Corp. v. Catrett,*  477 U.S. 317,

323 (1986).

**2.      Analysis of the release.**

A seaman's release and settlement agreement is governed by principles of federal

maritime law.  *Borne v. A&P Boat Rentals No.4, Inc.,* 780 F.2d 1254, 1256 (5th Cir. 1986).  The

Fifth Circuit has noted a "tension" between the competing interests protecting seamen as wards

of the admiralty and preserving settlement agreements:

> On the one hand we must be duly sensitive to the fact that, as a ward of the
> admiralty, a seaman . . . is entitled to our vigilant protection to avoid
> overreaching.  At the same time, courts have long and often observed that a
> hazard is associated with too stringent a rule on whether a settlement will be set
> aside.  If employers are denied any degree of confidence in the finality of a
> settlement, seamen will lose the option to settle since employers will have little
> incentive to avoid a full-scale trial on the merits.  Denying seamen that option is
> no kindness.

*Id.* at 1257.  The standard for judging a seaman's release was explained by the Supreme Court in

*Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 247 (1942):

> [T]he burden is upon one who sets up a seaman's release to show that it was
> executed freely, without deception or coercion, and that it was made by the
> seaman with full understanding of his rights.  The adequacy of the consideration
> and the nature of the medical and legal advice available to the seaman at the time
> of signing the release are relevant to an appraisal of this understanding.

Baker Hughes correctly asserts that the focus is on whether the release was knowingly

and voluntarily executed by Davis.  Baker Hughes contends the release was valid because Davis

fully understood his rights, and the rights he was giving up when he executed the release, which

was clear and unambiguous, and capable of being understood by Davis.  Baker Hughes notes that

the release was printed in clear terms, explained thoroughly, Davis had an opportunity to ask

questions, and he expressed his understanding that the release was full and final, and that he

would never be able to sue any of the released parties.  Baker Hughes contends that the release

was executed without duress, coercion, or any undue influence.

Baker Hughes also notes that Davis saw doctors of his own choosing to obtain medical

advice,[15] and that he understood his condition could become worse.  Baker Hughes points out

that Davis acknowledged his right to legal counsel and, if necessary, his right to file a lawsuit to

protect his interests.

Davis contends that he was never informed about the possibility of a diagnosis of RSD

and, therefore, he did not have an accurate understanding of his medical condition.  Davis argues

that adequate legal advice was never provided to him because he was not represented by his own

attorney, and that there was never a discussion concerning the legal merits of his claims against

Baker Hughes or the value of his claim.  Moreover, Davis contends that the circumstances

surrounding the release indicates deception, coercion, and overreaching.  Specifically, Davis

points to the fact that he and his wife were brought to Shuman Consulting and then to the law

offices of Lemle & Kelleher, L.L.P. under the false pretext of having a doctor's appointment.

### a.      Medical advice.

The Fifth Circuit has stated that "[a] mistaken diagnosis concerning the extent of a

plaintiff's injury has been recognized as a basis for setting aside a release."  *Charpentier v. Fluor

Ocean Services, Inc.* 613 F.2d 81, 85 (5th Cir. 1980).  For example, in *Bonici v. Standard Oil Co.,*

103 F.2d 437 (2d Cir. 1939), a seaman slipped and fell, injuring his left shoulder.  Prior to

executing a release, the company doctor informed the seaman that his arm was in "good shape"

and that the pain he was experiencing in his shoulder was caused by infected tonsils.  *Id.*  Based

on the diagnosis, the seaman signed a release.  *Id.*  In fact, the seaman required four months of

---

[15]There is no evidence in this record to indicate Davis ever saw "physicians of his own choosing," as suggested in the release.

additional treatment on his shoulder before he was able to return to work.  *Id.*  The court

acknowledged that at the time of the diagnosis, the injury was considered much less serious than

it was.  *Id.* at 439.  The court concluded that "[a] release induced by the diagnosis given by the

employer's doctor should not prevent the award of additional maintenance when the diagnosis is

shown to have been erroneous, even though it may have been quite honestly made."  *Id.*

Here, the information and advice Davis received concerning his condition was provided

to him primarily by Dr. George, a company-appointed physician.  Immediately before Davis was

presented with the release, he was given a letter from Dr. George indicating that Davis did not

suffer from an arm injury relating to the accident.  The letter did not mention that Dr. Leis'

report noted the possibility of a diagnosis of RSD, because Dr. George did not think RSD should

be part of the differential diagnosis.  However, a few months after the release was signed, Davis

was diagnosed with RSD, a diagnosis which Dr. George now agrees.[16]

Although Dr. Leis suggested the possibility of RSD and suggested further testing, none

was done and reflex sympathetic dystrophy was never discussed with Davis.  The court

concludes that the medical advice provided to Davis at the time of the release was not adequate.

### b.    Legal advice.

On January 26, 2005, Davis was driven to New Orleans to TODCO's adjusting firm and

then to the attorneys' offices under the pretext of taking him to a doctor's appointment.  Davis

did not have his own attorney present.

A review of the transcript of the proceedings during which the release was explained to

---

[16]*See* Exhibit F (Deposition of Dr. George), at 44-45.

Davis indicates that the contents of the release as it related to TODCO were thoroughly read and discussed with him.  However, there was no discussion of the legal merits of Davis' potential case against Baker Hughes or the value of his claim.  Further, because Davis did not have full information concerning his correct medical diagnosis, he was unable to appreciate the legal significance of executing a document releasing all parties from liability for a condition he did not even know he might have.  In addition, the attorneys reviewing the release with Davis represented adverse parties.  Thus, the legal advise provided to Davis was not from a disinterested party.  Therefore, Davis did not receive adequate legal advice before executing the release.

The evidence before the court indicates deception and overreaching in the obtaining of the release.  Davis did not have proper medical advice or legal advice.  Therefore, Baker Hughes has not shown the release was executed freely, without deception or coercion.  The Motion for Summary Judgment is denied.

**B.      Defendant's Motion for Rule 11 Sanctions.**

In light of the court's denial of Baker Hughes' Motion for Summary Judgment, Rule 11 sanctions are denied.

## CONCLUSION

Based on the foregoing, Baker Hughes' Motion for Summary Judgment is denied.  (Doc. #32).  Further, Baker Hughes' Motion for Rule 11 Sanctions is **DENIED**. (Doc. #40).

New Orleans, Louisiana, this  _29th_ day of September, 2006.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**